**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

DAVID GIGUERE,                                                    Civil Action No. 2:16-cv-00058-NT
on his own behalf and
on behalf of all others similarly situated,

       Plaintiff,

v.

PORT RESOURCES INC.

       Defendant.

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENTE AND OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Port Resources receives reimbursements from MaineCare for the Plaintiffs overnight direct support but refuses to pay wages for that same time. These Direct Care Professionals – Long Term Staff ("LTS") are required to leave their homes and families (with a few scheduled day-time breaks of complete freedom) in order to provide round the around the clock care as advertised and required to Port Resources' consumers. They cannot leave and they cannot entertain guests. Their families lose their consortium so that they can act as human alarms for Port Resources' customers instead of their own children. This is work.

Port Resources attempts to hide behind USDOL Regulations for sleep time. But those regulations do not contemplate this situation where the employer is required to provide services overnight and is reimbursed for those services. And they cannot apply where even though the employees are technically allowed to sleep they must have part of their brain working to detect problems. This is not the classic situation of firefighters sleeping soundly until the extremely rare occasion that an alarm wakes them. *See Armour & Co. v. Wantock*, 323 U.S. 126 (1994). These workers are hired to be the alarm and are held responsible if they sleep so soundly they the fail to

1

detect a problem. *Dunlop v. State of Rhode Island*, 398 F. Supp. 1269 (D.R.I. 1975). But even if the regulations apply, they cannot be reasonable as a matter of law. And even if they were reasonable as written, factual disputes prevent the court from finding as a matter of law that the employees were the primary beneficiaries of their overnight hours isolated at the worksite.

Plaintiffs move for summary judgment on counts I-III. Plaintiffs are entitled to summary judgment and Port Resources' motion for summary judgment should be denied.[1]

## I.    **Factual Background.**

Plaintiffs concur with much of Port Resources' description of their sleep time plan. Defendant's Motion pp. 2-3; Doc. 53. However there are additional intricacies. Port Resources advertises and provides 24-hour care to consumers[2] in its residential programs. (Plaintiff's Opposing Statement of Material Fact ("POSMF") ¶¶ 136, 138). This level of care is required both by the respective consumers individual service plan and by the Maine Department of Health and Human Services ("DHHS"). (POSMF ¶ 139). As a general rule, consumers were never to be left alone. (POSMF ¶ 137).

LTSs were ultimately responsible for the safety and well-being of the consumers under their care, even overnight. (POSMF ¶ 153). This responsibility extended to the overnight period and required them to prevent consumers from leaving overnight. (POSMF ¶¶ 150-51, 153). In order to do their job effectively, LTSs were required to keep an ear out and could not, as a matter of reality, close their door, listen to music or otherwise shut out the world. (POSMF ¶¶ 154, 158). In the overnight period LTSs were, by official policy, permitted only to record interruptions for a call to duty – an interruption where the LTS would have to tend to the

---

[1] To streamline the litigation, Plaintiff Giguerre withdraws count IV because the remedies would duplicate the remedies from counts II-III.
[2] Those individuals under the LTS' care are often interchangeably referred to either as "consumers" or "clients."

consumer that would have to be recorded on that consumer's clinical daily documentation. (POSMF ¶¶ 117-19, 123).

Port Resources billed Maine Care for services provided by the LTSs to the consumers on either a per diem or hourly basis. (POSMF ¶¶ 169-70). Port Resources could only bill on a per diem basis if the actual direct support hours provided to the consumers was between 92.5% and 105% of the total hours authorized. (POSMF ¶ 169). When totaling the number of hours, Port Resources included the LTSs' overnight hours, regardless of whether the LTS is awake or asleep or whether the LTS' house has overnight awake staff. (POSMF ¶¶ 172-74). If Port Resources did not reach the 92.5% to 105% threshold to bill on a per diem basis, they would have to bill on an hourly basis, which they would necessarily have to do if they could not count the LTSs overnight hours. (POSMF ¶ 170). For example if they only reached 92%, this would not result in a lower rate, but billing by the hour for this time would result in significantly lower amount of money reimbursed to Port Resources (POSMF ¶ 171). Since for many LTSs sleep time made up around 1/3 of their billed hours, not counting overnight time would result in billing only 66.6% of their contribution to Port Resources' target and a much lower total.  Therefore, in a workweek, 56 hours of an LTS' "sleep time" would be billed to Maine Care as "direct support hours." Without these "sleep" hours Port Resources could not reach the 92.5% to 105% threshold, showing that Port Resources was in effect directly paid for the overnight hours the same as other hours and that this work was a significant revenue driver (POSMF ¶¶ 167-74).

**II.      All Employee Work Time is Compensable.**

There is no occasion to look at the sleep time regulations because Port Resources own reimbursement requests to the State show that it engaged the services of the workers to provide "direct support" overnight. Though this applies to all LTSs, regardless of whether they had an

3

overnight staff support, it is particularly significant for those LTSs that did not have overnight staff support.

### A.     Port Resources charged the State for the overnight hours of all LTSs.

Port Resources should not be permitted to bill the State for direct support hours that it then turns around and tells its employees are "off duty" time. This cuts right to the heart of the question. If Port Resources is paid for these services by the State, then whether or not the Plaintiffs are asleep, as a matter of law the Plaintiffs' overnight service primarily benefits Port Resources. *See Hultgren v. County of Lancaster*, Neb., 913 F.2d 498 (8th Cir. 1990) ("[w]e have no difficulty concluding, under all of the above circumstances, that plaintiffs were required at all times during their scheduled "sleep time" to be at LOMAR's facilities "ready to serve," and "were not there for the purpose of sleep nor for any purpose of their own, but for their employer's benefit.")[3] Because MaineCare paid for these direct support services, as a matter of law, the LTSs were engaged to provide that compensated service even while sleeping (even if they had overnight staff and were not acting as the alarm). *Smith v. Superior Casing Crews*, 299 F. Supp. 725, 18 W.H. Cases 888 (E.D. La. 1969) ("Customers paid Superior for all employee time spent on the job site, so both Superior and its customers must have considered this to be work time.")

Because the workers are providing a required service overnight, a service that Port Resources would otherwise have to pay a different worker to complete, the work is necessarily always for Port Resources benefit.[4] *See Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 65 (2d Cir. 1997)("During their lunch break, the workers are restricted to the site for the purpose of

---

[3] A subsequent Eighth Circuit case attempted to limit *Hultgren* to the facts that the employees were relief workers. *Bouchard v. Regional Governing Bd.*, 939 F.2d 1323 (8th Cir. 1991). But the logic of the primary beneficiary test applies even more strongly because each extra day of work, far from making the worksite seem more like a home, cumulated the sleep deprivation and the estrangement from their families and friends.

[4] This applies equally to those LTSs who had overnight staff, as Port Resources did still count their overnight hours for MaineCare billing purposes. (POSMF ¶ 174).

performing valuable security service for the company. The importance, indeed indispensability, of these services is evidenced by the mandatory nature of the restrictions that surround the workers' lunch break. To be sure, the workers perform different services during meal breaks than throughout the rest of the day, but the workers' on-site presence is solely for the benefit of the employer and, in their absence, the company would have to pay others to perform those same services. By not compensating these workers, SNET is effectively receiving free labor.").

### B.   LTSs without overnight staff support were working through their nights.

Time spent in physical or mental exertion for the employer's benefit, no matter how burdensome, is always work time. *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944). Because the LTSs, at least when no one else is on duty, are constantly providing their mental exertion by keeping their brains open to work-related stimuli, they are working as the alarms. The workers are never freed from the mental exertion that would allow them to get the same type of sleep as they would at home. This is common human experience, but it is also backed by brain science where recent studies show that the left-brain stands guard while the right brain sleeps when one sleeps in a new place.[5] There is scant first circuit case law on overnight work, but a decision by a sister Federal District Court of Rhode Island explained this distinction perfectly when explaining why house parents sleep time must be compensated:

> The fireman is free to direct his thoughts and attentions wherever be may choose, until the alarm bell calls him into action[6]. A house parent, on the other hand, has, as the evidence shows, a continuing responsibility for the care of a group of children. His job requires more of a constant vigil, more of an ongoing exercise of judgment. The stimuli to which he may have to respond during the night are more complicated and subtle than an alarm bell. To the house parent falls the duty of perceiving an emergency in the first instance; a fireman is required only to respond to an alarm signaling an emergency already perceived by another. With the duty of maintaining peace

---

[5] Tamaki, Masako, et al. "Night watch in one brain hemisphere during sleep associated with the first-night effect in humans." *Current biology* 26.9 (2016): 1190-1194. Available at http://www.cell.com/current-biology/fulltext/S0960-9822(16)30174-9

[6] But even firemen may be working while sleeping if the "sleep allowed was a fitful one at best, which might be said to have been with one eye open in anticipation of the moment they would be called upon to jump to the response of an alarm." *General Electric Co. v. Porter*, 208 F.2d 805, 815 (9th Cir. 1953).

and quiet in his cottage throughout the night, the house parent is responsible even for the *prevention* of emergencies: the fireman "on call" has no such responsibility.
*Dunlop v. State of Rhode Island*, 398 F. Supp. 1269 (D.R.I. 1975).

Here the facts are undisputed. Where LTSs did not have overnight awake staff, as is the case with Opt-In Plaintiffs Robert Bissell, Theresa Bissell, Deborah Dow, Lindsay Gagne, Paige Harris, Ryan Jarrell, Renee Jordan, Susan MacDonald, Eulade Nkurunziza, Sylvia Ouellette, Lee Southwick, Zu-Chyun Speaker, Kenneth Cole, Renovat Baragengana and Neverly Ruda, it was their job to fulfill Port Resources obligation to the State to provide 24-hour care by not sleeping soundly.[7] *See Hultgren v. County of Lancaster*, 913 F.2d 498, 500 (8th Cir. 1990) ("Regardless of where they spent their "sleep time," the relief employee's job was "to sleep with one eye and one ear open" to ensure the safety and well-being of the residents."). Finally, Port Resources barred LTSs with overnight staff from leaving overnight, despite the consumers ostensibly being cared for by the overnight staff. (POSMF ¶¶ 21, 152). Since Port Resources sought reimbursement for the sleeping hours of LTSs with overnight staff , (POSMF ¶¶ 173-74), the lack of freedom, even to briefly leave the premises even while remaining on call, mostly served the purpose of getting free reimbursements from MaineCare.

III.   **Port Resources cannot carry its burden to establish that § 785.22 or § 785.23 can be properly applied to exclude the LTSs' overnight time from hours worked.**

The FLSA starts with the concept that the workweek ordinarily includes "all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place." *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946)). Under 29 CFR 785.20 the general rule is that "[u]nder certain conditions an employee is considered to be working even though some of his time is spent in sleeping or in certain other activities." And

---

[7] In addition, overnight staff would often need the assistance of LTSs where a consumer was difficult or if the consumer had an existing relationship with the LTS. (POSMF ¶ 155). Even with overnight staff, several LTSs, such as Long Cao and Cynthia Cookinham, were usually unable to get an uninterrupted night's sleep. (POSMF ¶ 164-65).

these principles control even if there is an agreement to the contrary. 29 CFR § 785.8. But in certain situations the regulations carve out an exception where the workers agree to not be paid for a "bona fide" sleeping period. It is the employer's burden to show that the exception applies. *Johnson v. City of Columbia, SC*, 949 F.2d 127 (4th Cir. 1991). ("Since the City seeks to come within the meal time and sleep time exceptions, the burden is on the City to show that it is entitled to the benefits of those exceptions.")

There are two exceptions that are relevant, but inapplicable, to this case: (i) 29 C.F.R. § 785.22; and (ii) 29 C.F.R. § 785.23. As is the case with all statutes and regulations governing the work and hours of employees, §§ 786.22 & .23 are to be construed in the manner most favorable to the employee. *See, e.g., Marsuq v. Cadete Enters.*, 807 F.3d 431, 438 (1st Cir. 2015)("The burden is on an employer to prove an exemption from the FLSA's requirements, and the remedial nature of the statute requires that [its] exemptions be narrowly construed against the employers seeking to assert them."). However, even if those regulations were to be read more broadly, neither actually applies to Port Resources' sleep time plan as written or as implemented.

### A.     29 C.F.R. § 785.22 Does Not Apply to Port Resources' Sleep Time Plan.

29 C.F.R. § 785.22 states:

**(a) General.** Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.
**(b) Interruptions of sleep.** If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22 was designed for employees who reside on their employers premises or otherwise are "on duty" for 24 hours or more in a given period, but who do not live on their employers' premises. *Exclusion of Sleep Time from Hours Worked by Domestic Service Employees*, Field Bulletin 2016-1 (Dep't of Labor April 25, 2016) ("2016 Bulletin"). Generally, for sleep time to be excluded under § 785.22: (i) the employee must be provided adequate sleeping facilities; (ii) the employee must usually enjoy an uninterrupted night's sleep; and (iii) the parties must have an express or implied agreement to exclude sleep time. 29 C.F.R. § 785.22(a). Even when those general requirements are met, on any given night an employee must be paid for interruptions to his sleep, and where an employee cannot get reasonable periods of sleep totaling at least five hours, the entire period must be considered working time. 29 C.F.R. 785.22(b). Where these requirements are not met, the employer is barred from excluding sleep time. Both in (i) written policy and in (ii) implementation, Port Resources' sleep time policy does not satisfy these requirements.

> **1.     29 C.F.R. § 785.22 does not apply to Port Resources' sleep time policy as written.**

§ 785.22 cannot apply to Port Resources' sleep time policy as it is written, thereby rendering the sleep time hours of all LTSs compensable regardless of when or how often they were awakened throughout their nights. § 785.22 requires both that the employee be on duty for 24 hours or more, that the employee usually enjoy "an uninterrupted night's sleep" and that, if the employee is interrupted by the workplace such that the employee cannot get a reasonable night's sleep, the entire sleep period should be considered work and therefore is payable. 29 C.F.R. § 785.22. These requirements cannot be fulfilled under Port Resources' written policy.

**a.      LTSs are not "on duty" for 24 hours on some days.**

LTSs, by Port Resources policy, are not "on duty" for 24 hours or more on some days of their shifts. Their "on duty" period is broken up by four-hour breaks they receive four times per week. (POSMF ¶ 13). Pursuant to the U.S. Dep't of Labor's Wage & Hour Division's ("WHD") August 18, 1988 letter, "an off-duty period (free-time) during a weekday for such employees 'breaks' an on-duty period" and thereby renders § 785.22 inapplicable. *Hours worked in Residential Care (Group Home) Establishments – Sleep Time and Related Issues – Enforcement Policy* (U.S. Dep't of Labor, June 30, 1988) ("1988 Memo"). Port Resources acknowledged this in in their motion for summary judgment. Defendants' Motion pp. 4-5; Doc 53.

**b.      Port Resources is unable and unwilling to fulfill its end of the agreement required for § 785.22 to apply.**

An agreement to exclude sleep time can only be reasonable if the sleep time referenced therein is bona fide. And in order to be bona fide the employer must be able to show that the employee usually gets an uninterrupted night's sleep. If the employees usually do not get a good night's sleep uninterrupted by the stimuli related to work, then the agreement is automatically invalid and the sleep time must always be compensated for all nights on the employer's premises. *See Hultgren v. County of Lancaster*, 913 F.2d 498, 506 (8th Cir. 1990) ("the very nature of plaintiffs' jobs required that they be ready for frequent nighttime interruptions.") § 785.22(a). Port Resources (and some courts) conflates this "uninterrupted" nights sleep requirement in section (a) with the mandate that sleep time be counted as work on any given night if interruptions prevent a "reasonable night's sleep" but which sleep need not be continuous. In reality the first is a mandate before having any sleep policy, and the second is an additional protection on any given abnormal night. *Bagoue v. Developmental Pathways, Inc.*, 2017 WL 4236316 at*3 (D. Colo. Sept. 25, 2017) ("In order for an employer to institute a policy

9

of excepting sleep time, employees must 'usually enjoy an uninterrupted night's sleep.' 29
C.F.R. § 785.22(a). When an employer institutes an otherwise valid policy to exclude sleep time,
an employer must offer compensation for all sleep time if, on a particular occasion, the employee
receives less than five hours of total sleep. 29 C.F.R. § 785.22(b)".)

The 2016 Bulletin correctly and clearly explain the difference: "Under 29 C.F.R.
785.22(a), the five hours of sleep must be continuous, whereas under 29 C.F.R. 785.22(b),
described in more detail below, the five hours need not be continuous but rather may be the
cumulative total of 'reasonable periods' of sleep. This distinction reflects the different purposes
of these two provisions."

Port Resources' sleep time policy on its face referenced five total hours of sleep and
provided no way for the workers to show that they usually got an uninterrupted night's sleep.
Port Resources explained the law wrong in its policy leaving the workers to believe that quick
interruptions that required no or de minimus duty time and no clinical notes could not be
recorded or count as broken sleep. (POSMF ¶¶ 119, 123). And because of this, Port Resources
has no way to carry its burden to show that the workers usually were able to get an uninterrupted
night's sleep. If anything, the interpretation of five continuous hours on half of the nights is too
low to be consistent with the rule, and therefore not entitled to deference. The scientific
consensus is emphatic:

> Adults should sleep 7 or more hours per night on a regular basis to promote optimal health. •
> Sleeping less than 7 hours per night on a regular basis is associated with adverse health outcomes,
> including weight gain and obesity, diabetes, hypertension, heart disease and stroke, depression,
> and increased risk of death. Sleeping less than 7 hours per night is also associated with impaired
> immune function, increased pain, impaired performance, increased errors, and greater risk of
> accidents.  Watson, Nathaniel F., et al. "Recommended amount of sleep for a healthy adult: a joint
> consensus statement of the American Academy of Sleep Medicine and Sleep Research
> Society." *Sleep* 38.6    (2015):    843-844.    At    https://academic.oup.com/sleep/article-
> lookup/doi/10.5665/sleep.4716[8]

---

[8] https://aasm.org/resources/pdf/pressroom/adult-sleep-duration-consensus.pdf   Nathaniel F. Watson, MD, et al.
Journal of Clinical Sleep Medicine

The point of 28 CFR 785.22(a) is that workers must be able to sleep soundly most of the time. An interpretation that allows incomplete sleep all of the time, and zero sleep or broken up sleep half the time defies the regulation's purpose. The obvious intent of the regulation, consistent with the firefighters in *Skidmore*, is that the workers should get the same type of sleep they would get at home the vast majority of nights.[9] It is undisputed that this did not happen here. Moreover, in order to even be able to carry its burden, Port Resources lacks any evidence to show that the LTSs were able to usually enjoy an uninterrupted night's sleep and that, on any particular night the interruptions were not so frequent so as to prevent reasonable periods of sleep because Port Resources failed to track when all relevant interruptions occurred.

> i.    *Port Resources does not track when LTSs are interrupted.*

Port Resources, by official policy, does not consider *when* during the night a LTS' sleep is interrupted. (POSMF ¶¶ 115-16). Without such information the employer has no clue how often their employee is able to enjoy five consecutive hours of sleep, or whether the sleep periods are reasonable in a particular night.

Port Resources' timesheets and payroll systems do not take into account *when* in the night LTSs were awakened, and were in fact concerned only with how *long* clinical interruptions were. (POSMF ¶¶ 115-16). For example, there was no system at all for recording a brief period awake to listen for a consumer before determining that there was nothing to worry about. (POSMF ¶ 117-19, 123). By policy, actual clinical interruptions were to be recorded by the LTS on their respective consumer's clinical daily documentation, but that documentation was not taken into account or even reviewed by Port Resources to determine whether it improperly broke

---

[9] Undersigned counsel admits as a parent of young children that my mind can't function enough to remember the last uninterrupted night's sleep. But the fact that I am free from any employer's dictate and therefore present most nights to sacrifice my sleep for my family, is exactly the freedom that is lost by the workers here.

up continuous sleep, whether that LTS received a reasonable night's sleep, or whether that LTS could usually enjoy an uninterrupted night's sleep. (POSMF ¶¶ 115-19, 121-23).

> ii.    *Port Resources' Sleep Time Policy permitted LTSs to record only clinical interruptions.*

Port Resources lacks any evidence to carry its burden to show that the LTSs were able to get reasonable periods of sleep. Port Resources' official policy only instructed recording clinical interventions and not, for example, every time an LTS was forced to turn over in bed to contemplate a client's noise or get out of bed quickly to check on a client that did not need clinical help. (POSMF ¶¶ 117-19, 123). This overtly narrows the requirements of § 785.22, which despite using the same phrasing ("call to duty") does in fact require compensation for all interruptions related to the work, and not solely for those of a nature that would require direct interaction and reporting in the consumer's clinical daily documentation. *See Hultgren v. Lancaster*, 913 F.2d 498 (8th Cir. 1990).

The Eighth Circuit Court of Appeals in *Hultgren*, when referencing interruptions included in its listing of valid interruptions that caused an employee to "sleep with one eye and one ear open" the following actions of consumers: "taking frequent loud and disruptive trips to the bathroom and kitchen," "talking in their sleep," "waking up and wandering around," "watching the television" and "attempt[ing] to escape or leave the facility." *Id.* at 500. Conspicuously absent, however, is any reference to a requirement that the employee in question be required to physically tend to the consumer. Port Resources seems to have developed this requirement without reference to any guidance or legal opinion,[10] and has therefore barred LTS's from recording information crucial to determine whether the agreement to exclude sleep time under § 785.22 is reasonable. And that although the workers had no reason to track exactly when

---

[10] (POSMF ¶ 143).

they were quickly awoken, Port Resources lacks any evidence to contradict the statistical likelihood that these wake ups broke up most nights so that five continuous periods of sleep was impossible.

### 2. 29 C.F.R. § 785.22 does not apply to Port Resources' sleep time policy as applied.

Even if Port Resources' sleep time policy were reasonable as written, the reality of Port Resources' implementation of its sleep time policy failed to meet the requirements of § 785.22. Specifically: (i) multiple LTSs were told by their supervisors or otherwise given the impression they were to restrict or downplay their overnight interruptions; and (ii) multiple LTSs were unable to enjoy five consecutive hours of sleep on most nights.

### a. Many LTSs were told by their supervisors or otherwise given the impression that they were to restrict or downplay their overnight interruptions.

Despite having a sleep time policy that stated that LTSs would be paid for interruptions to their sleep time, multiple LTSs were either told by their managers, supervisors or were just generally given the impression by Port Resources that they should not report all of their overnight time. Specifically:

- Opt-In Plaintiff Kellon Alexis was given the impression that he would only be compensated for interruptions caused by his consumers' medical issues. (POSMF ¶ 125);

- Opt-In Plaintiff Renovat Baragengana was told that he could only record 96 hours on his time sheet and that he could only get paid for overnight time when his consumers had night terrors. (POSMF ¶ 126).

- Opt-In Plaintiff Robert Bissell was told that interruptions of less than an hour would not be paid out. (POSMF ¶ 127).

13

- Opt-In Plaintiff Mary Feeley was told by her supervisor that she should not record interruptions of less than an hour. (POSMF ¶ 128).

- Opt-In Plaintiff Lindsay Gagne was told that she would not be paid for interruptions to her sleep because she had an overnight staff. (POSMF ¶ 129).

- Opt-In Plaintiff Susan MacDonald was told by Michelle Thiffault that she should not bother recording short interruptions. (POSMF ¶ 130).

- Opt-In Plaintiff Sylvia Ouellette knew that Port Resources could not afford to pay her, so she did not report interruptions as often because she didn't want to make a fuss and potentially lose her job. (POSMF ¶ 132).

- Opt-In Plaintiff Christine Poore was told that short interruptions throughout the night were just part of the job of being an LTS. (POSMF ¶ 133). Opt-in Plaintiff Zu-Chyun Speaker was given a similar impression. (POSMF ¶ 135).

- Opt-In Plaintiff Lee Southwick was told that unless she was awakened for more than an hour that she would not be paid for that interruption and she should not bother putting it on her time card. (POSMF ¶ 134).

- Most egregiously, Opt-In Plaintiff Ryan Jarrell was forced by his supervisors to report his interruptions by computer as soon as they happened, forcing him to disturb his sleep further. Previously he was able to report the interruptions on his timesheet the next morning. (POSMF ¶ 124).

This is significant for three reasons. First, Port Resources was seeking to avoid fulfilling its obligation to pay the LTSs for their overnight time, particularly with regard to Opt-In Plaintiff Jarrell. Secondly, the varying requirements show that, even if Port Resources was attempting to fulfill its obligations under § 785.22, they were unable to maintain uniformity across its various

14

programs. And third, the sheer volume of such reports shows that this was not an irregular instance, but rather a companywide policy of minimizing, disregarding and discouraging the proper reporting of interruptions to the LTSs' sleep. This policy as implemented is illegal and cannot be reasonable, even as to the workers that were seldom disturbed or had overnight staff.

> **b.** **Many LTSs were often unable to enjoy five consecutive hours of sleep on most nights.**

A keystone of the reasonable agreement that allows Port Resources to exclude sleep time is the LTS' ability to enjoy an uninterrupted night's sleep on most nights. Not only was Port Resources unconcerned with whether this element of the agreement was realized, in reality a great many LTSs were unable to enjoy five consecutive sleep on most nights of their shifts. At least Renovat Baragengana, Lindsay Gagne, Susan MacDonald, Cynthia Cookinham, Zu-Chyun Speaker, and Long Cao were unable to get at least five consecutive hours of sleep on most nights of their shifts. (POSMF ¶¶ 159, 161-62, 164-66). Others, including Deborah Dow and Lee Southwick, can be sure they could not get at least five consecutive hours of sleep on at least three nights of their shifts and cannot say whether they were able to get five consecutive hours of sleep on the other nights of their shifts. (POSMF ¶¶ 160, 163). That Dow and Southwick would be unable to provide precise information is unsurprising, given Port Resources' failure to record or take account of when interruptions occurred.[11]

### B. 29 C.F.R. § 785.23 Does Not Apply to Port Resources' Sleep Time Plan.

29 C.F.R. § 785.23 while occasionally conflated with § 785.22 is not an exception, but instead just creates a mechanism for workers and employers to estimate hours when keeping track is difficult. It reads:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may

---

[11] *See supra* section III.A.1.b.

engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home.

§ 785.23, unlike § 785.22, is designed for "live-in" employees who reside at their employers' worksite. The text of § 785.23, much of which has been misapplied and largely disregarded, specifically notes that it applies only to those "that [are] not considered as working all the time [they] are on the premises." 29 C.F.R. § 785.23. For the purposes of both fulfilling Port Resources' obligations to the State and to receiving payment from the State, *all* of each LTS' time on Port Resources' houses was considered "direct support hours," i.e. work time. § 785.23 further notes that the employee should be able to "engage in private pursuits" and have periods "of complete freedom from all duties when he may leave the premises for purposes of his own." LTSs had no such freedom during their "sleep time" hours, and their time of freedom was carefully scheduled and counted. This was not homelike.

The inclusion of the "complete freedom" language in § 785.23 along with the language referencing the regulation's use where "it is difficult to determine the exact hours worked" shows that that regulation contemplates a significantly different system than the one put in place by Port Resources. § 785.22 was created for the situation like here where the worker is at the ready the entire time, and that is why it provides the additional protection that the worker has to usually get uninterrupted sleep.

The proper application of § 785.23 relates to situations where the employee works for a number of hours per day estimated based upon "all pertinent facts." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 200-01 (4th Cir. 2005) ("The regulation contemplates situations in which it is difficult, if not impossible, to determine the exact amount of time

worked"), *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 942 (9th Cir. 2004) ("Rather than providing employers with an exception to the FLSA overtime pay requirements, § 785.23 simply offers a methodology for calculating how many hours the employees actually worked within the meaning of the FLSA.") A more fitting system might pay the LTS for 18 hours in a given day, acknowledging that "it is difficult" to determine the hours an LTS works overnight, but estimates that a particular LTS may work the equivalent of 2 hours. For example, in *Brigham v. Eugene Water & Elec. Bd.*, the Ninth Circuit analyzed an agreement where the workers were subject to emergency calls, but the calls were only once or twice per month so that the workers had long uninterrupted personal time. The Court expounded on the correct use of Section 785.23:

> And the employees each testified to having actually enjoyed a wide variety of activities during their duty shift call time: sleeping, eating, reading, studying, exercising, watching television, helping their children with homework, playing games, maintaining their homes and yards, working on their motorcycles, and entertaining guests. Analyzed in this light, the parties' agreement treating the otherwise formally uncompensated duty shift call time as equivalent to four hours' actual work is eminently reasonable. *Id*.

Instead, Port Resources has disregarded both of those portions of the plain language of § 785.23. Under Port Resources' sleep time policy, it is not difficult to determine the number of hours the LTS works – they work all day, everyday (other than their set breaks) providing direct support to their consumers. And other than those days when they have their breaks (scheduled, and therefore not difficult to number), the LTSs have no period where they have complete freedom from all duties and certainly are not permitted to leave the premises, as they are barred from leaving during both the day during their "work hours" and during the night during their excluded sleep time. And Port Resources did not attempt to make an agreement for the value of the equivalent value of the duty during the overnight hours but instead completely excluded it.

Nonetheless, even if § 785.23 were to contemplate its application to systems like the one developed by Port Resources, Port Resources cannot carry its burden to show the agreement is

reasonable. *Leever v. City of Carson,* 360 F.3d 1014, 1018 (9th Cir. 2004) ("As the party seeking the benefit of section 785.23, [employer] bears the burden of proving that the employment agreement at issue was reasonable.") Port Resources fails to carry this burden either as the agreement is written or applied because it cannot show that the workers resided for an "extended period" in a homelike environment or that they were able to get reasonable sleep.

### 1.      § 785.23 does not apply to Port Resources' sleep time plan as written.

Port Resources is liable for all overnight hours of each of the LTSs, including those who signed sleep time agreements[12] and those who had overnight staff, unless its can show that § 785.23 applies to allow exclusion of those hours. Port Resources cannot make any such showing, as (i) the LTSs did not reside at their worksite for an extended period of time; (ii) the sleep time agreement as written is not reasonable; and (iii) LTSs were not provided with a private quarters in a homelike environment.

### a.      The LTSs do not reside at their worksite on a permanent basis.

Section 785.23 applies to workers that reside permanently or for an extended period of time. The workers here all permanently resided off-site during their employment and only temporarily stayed on site during their work shifts while working the entire time. See 2016 Memo ("An employee who resides at her worksite fewer than seven nights a week almost certainly has another home and in the majority of cases therefore stays at the worksite in significant part for the employer's benefit.") The reason why there are seemingly relaxed rules for those that reside on a worksite permanently compared to those that reside for just a few days is that normally a worker adjusts to the new home after a few days and can carry on a normal life with friends and family. Like after any move, each additional day is more relaxing. But here it is

---

[12] Regardless of when they signed the sleep time agreement.

the opposite - there is no time for relaxing and the sleep deprivation adds up over the seven nights, leaving the workers completely exhausted.

Port Resources attempts to rely on the 1988 Memo to support its argument that the LTSs do in fact reside on the premises for an extended period of time. However, the 1988 Memo supports the workers. The Memo, which was specifically written to clarify confusion caused by a previous letter, states that the WHD will "consider an employee . . . to reside on the premises for an extended period of time within the meaning of IB 785.23 if the employee resides on the premises for a period of at least 120 hours in a workweek."  The 1988 Memo further defines "workweek" as "seven consecutive 24 hours periods" and specifically references 29 C.F.R. § 778.105, which is the regulation that allows employers to define the workweek for FLSA overtime purposes. The purpose of this was to establish that those that lived and worked five days in a group home or dormitory could be relieved by relief staff working the extra two days without that two day break destroying the status under 29 C.F.R. § 785.23, meaning that at very least the employees were working those five days in a single pay period. The reason to make the requirement fit within the workweek is that it was assumed that after the relief employee served in her place, the worker would typically return for five days in the next workweek because it was one workers normal residence.

The problem is that Port Resources was too clever by half by trying to get two workers to each be considered to occupy the same bed for extended periods of time when neither was the primary occupant. In order to lower its overtime obligations, Port Resources divided the seven-day shift into two workweeks so that the LTSs (not counting disputed sleep-time) worked roughly 40 hours in one week and 56 in another week, instead of 96 in one week. (POSMF ¶

145). When applying Port Resources' version of the "workweek," there are effectively *four* "workweeks" for every two weeks worked by each pair of LTSs.

For example, LTS A and LTS B work the two-week period from Thursday the 1st through Thursday the 15th. LTS A takes the first shift, and is paid for his first "workweek" (workweek 1) from Thursday the 1st through Saturday the 3d. LTS A then works a second "workweek" (workweek 2) from Sunday the 4th through Thursday the 8th. LTS B then takes over and works his first "workweek" (workweek 3) from Thursday the 8th through Saturday the 10th, and then works a second "workweek" (workweek 4) from Sunday the 11th through Thursday the 15th. That is four full-time workweeks in one room during a two-week period.

There is no question that 29 C.F.R. § 778.105 permitted Port Resources to split the week this way. However, § 778.105 also states that "[o]nce the beginning time of an employee's workweek is established, it remains fixed regardless of the schedule of hours worked by him." Because Port Resources made this choice, none of the potential class members worked 120 hours in a "workweek," and therefore they did not stay on the premises for an extended period of time. Therefore none of the LTSs resided on their worksite for the requisite period of time for § 785.23 to apply, and are therefore entitled to be paid for all of their overnight hours.

> **b.     The agreement between the LTSs and Port Resources was not reasonable.**

A reasonable agreement between an employer and an employee to exclude sleep time must: (i) take into account all pertinent facts; and (ii) not be unilaterally imposed by the employer.

   *i.*   *Port Resources' sleep time agreement did not take into account all pertinent facts.*

Port Resources sleep time agreement failed to account for several significant factors. First, that Port Resources, while dealing with the LTSs to exclude overnight time was billing that same time to the State as "direct support hours." Second, that despite the specific edict of § 785.23, the LTSs could almost never "engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own." And third, that Port Resources did not take into account all relevant interruptions and when those interruptions occurred.

As noted *supra* section II, Port Resources regularly counted the LTS' overnight hours, including those hours when the LTS was supported by an overnight staff, as "direct support hours" for the purposes of billing and fulfilling its obligations to the State. In essence, Port Resources was simultaneously telling the LTSs that their overnight hours were excludable while telling the State that *those same hours* were "direct support hours." (POSMF ¶ 172, 174). Port Resources should not be permitted to have it both ways, creating a system where the only party to not receive a benefit from the LTSs' overnight hours are the LTSs themselves.

Finally, as described above, Port Resources' system for recording interruptions discouraged LTSs from reporting time and failed to properly record whether the LTSs could regularly enjoy an uninterrupted night's sleep and whether, in a particular night, interruptions were so frequent so as to prevent reasonable periods of sleep.[13] Further, Port Resources actively discouraged reporting of overnight interruptions.[14] Failing to even collect this information means that Port Resources could not possibly have all the facts necessary to develop its sleep time

---

[13] *See supra* section III.A.1.b.
[14] *See supra* section III.A.2.a. Note in particular Opt-In Plaintiff Jarrell, who reported interruptions seemingly too often. Rather than making a change to their system or adding an overnight staff, Port Resources made reporting more difficult. (POSMF ¶ 124).

policy under § 785.23, which specifically requires any such agreement to be based upon all pertinent facts. Instead, Port Resources seemingly built a sleep time policy, imposed it upon the LTSs and rather than collect the information necessary to properly determine whether the agreement was an accurate reflection of the work done by the LTSs, imposed and restricted the LTSs from reporting aberrations. Such an agreement cannot be reasonable.

> ii.   *Port Resources sleep time policy was unilaterally imposed on its employees.*

Port Resources developed its sleep time policy based upon a wage and hour recommendations and consultations with another home care agency, and not any of its employees. (POSMF ¶¶ 41, 141-43). Further, for those LTSs already working with certain consumers in facilities being changed to the overnight live-in system, like Opt-In Plaintiff Susan MacDonald, the sleep time policy was a condition of continued employment with their consumers. (POSMF ¶ 144). Finally, Port Resources' inaccurate explanation of the law and the failure to properly account for interruptions to the LTSs sleep time meant that no LTS could possibly have sufficient information to be able to properly bargain for an "employer-employee" agreement, as is required by § 785.23. 2016 Bulletin. Because the workers did not participate in the negotiation and it was a condition for being an LTS, the agreement is not valid. *See Hultgren v. County of Lancaster*, Neb., 913 F.2d 498 (8th Cir. 1990) ("Nor did plaintiffs agree that their "sleep time" could be uncompensated. The Deputy Administrator's 1985 opinion letter stresses that only "mutually agreed-upon" sleep time may be excluded: the exclusion of sleep time may not be the "unilateral decision of the employer." The magistrate in this case found LOMAR's post-*Garcia* contracts "were drafted exclusively by the defendant with no input or negotiation from the plaintiffs or even any bargaining agent for them.... The evidence is uncontradicted that

the contracts at issue in this case were most certainly presented on a take-it or leave-it basis without any possibility for negotiation by the plaintiffs.")[15]

The Second Circuit Court of Appeals refused to apply Section 785.23 to a police department that, as a condition of employment, forced a policy that only paid police dog handlers two hours of off-duty time with the dogs because the employees and the employers did not come to the agreement together after considering the pertinent facts. *Holzapfel v. Town of Newburgh, NY*, 145 F.3d 516 (2d Cir. 1998). The court stated "No evidence suggests that plaintiff or any K-9 officer was involved in deciding that two hours of overtime was sufficient to care for a dog. Rather, the directive appears to have been unilaterally imposed by defendants." *Id.* at 527. The Court concluded that "[i]nvolving both employee and employer representatives in negotiations to decide how many off-duty hours will be compensated is a simple solution benefiting all parties." *Id.*

        c.    **The LTSs did not reside in private quarters in a homelike environment.**

§ 785.23 has been interpreted to require the employer to provide the employee with "private quarters in a homelike environment." 1988 Memo, 2016 Bulletin. Port Resources does supply some of the basic necessities for an LTS in its facilities. (POSMF ¶ 16). But it disregards the requirement that the employee be "able to leave his or her belongings during on-and off-duty periods." 1988 Memo. LTSs work a one-week on, one-week off schedule, meaning that each house has at least two LTSs assigned to it, though they do not work at the same time. (POSMF ¶ 9). Port Resources assigns the two LTSs to the same room in their house, which they share. Although Port Resources did not have a rule barring the LTSs from leaving personal items in

---

[15] The Eighth Circuit failed to adhere to this logic the following year in *Bouchard v. Regional Governing Bd.*, 939 F.2d 1323 (8th Cir. 1991). But the logic of *Hultgren* and the blistering dissent in Bouchard is the more persuasive reading of § 785.23.

their room, the fact that the LTSs shared a space meant that, as a matter of practicality, they could only leave personal items behind when they agreed with their LTS off-week counterpart to do so. (POSMF ¶ 146). Furthermore LTSs were effectively required to keep their doors open and pay some attention to the consumers, as the LTSs knew they were ultimately responsible for their consumers. (POSMF ¶¶ 154, 157-58).

### 2. § 785.23 does not apply to Port Resources' sleep time plan as implemented.

The agreement reflected in Port Resources' sleep time policy, though invalid on its face, was not an accurate reflection of the reality of the work performed by the LTSs. As implemented, Port Resources' policy does not comport with the requirements of § 785.23 because (i) the practical reality of the agreement between Port Resources and the LTSs is unreasonable; and (ii) Port Resources did not take the steps required to satisfy its obligations under § 785.23.

### a. The agreement between Port Resources and the LTSs was not reasonable.

The agreement by and between Port Resources and the LTSs was not reasonable because, as noted above, many LTSs were unable to get at least five consecutive hours of sleep on most evenings of their shifts. Further, despite the "sleep time agreement," LTSs had many significant responsibilities during their overnight shifts.

### i. Many LTSs were in fact unable to get five hours of reasonable sleep.

Port Resources' sleep time policy incorrectly explained the law as to when a LTS could claim sleep time as work time, and therefore is per se unreasonable. The sleep time policy only allows compensation for a night when a worker only gets less than five hours total sleep regardless of how many interruptions divided up that time. But while sleeping five total hours is

a necessary prerequisite, it is not the entire inquiry. The five hours must also be had in reasonable periods free of interruptions.   The WHD provides the following example: "In circumstances in which interruptions are more frequent, such as if the consumer needs the employee's services at 12:30am, 2:00am, 4:00am, 5:00am, and 6:00am for twenty minutes each time, the periods between interruptions are not reasonable periods of sleep, and the five-hour threshold will not be considered met." 2016 Bulletin.. That Port Resources unable and unwilling to take stock of whether the LTSs were actually able to enjoy reasonable periods of sleep shows both that the agreement underlying its application of § 785.23 was invalid and that Port Resources failed to consider if the workers were in fact the primary beneficiaries of their time.

ii.     *LTSs had numerous restrictions and responsibilities overnight.*

Among the premises of § 785.23 is that during the overnight period the employee should regularly be free from duty. Though Port Resources contends otherwise, it is ludicrous to believe that the LTSs, even LTSs with overnight staff, were not expected to keep an eye and an ear out for the consumers overnight. It is undisputed that LTSs were charged with ensuring that the consumers under their care did not leave, (POSMF ¶ 150) and that if the LTS left it would be a "violation" and a "reportable event to the [S]tate" for neglect. (POSMF ¶ 151). LTSs were responsible for the consumers under their care, (POSMF ¶ 153), and would be responsible if anything happened to them. (POSMF ¶ 157). With all this responsibility, it is disingenuous to assert that the LTSs were free from duty in the overnight period.

**b.     Port Resources did not properly account for interruptions to the LTSs' sleep.**

As noted above, *supra* sections III.A.1.b & III.A.2.a, Port Resources not only did not correctly account for interruptions to the LTSs' sleep, but actively discouraged LTSs from

properly accounting for their overnight time and created no mechanism for recording work related interruptions to sleep that were not clinical. Accordingly, even if the sleep time agreements upon which Port Resources relies were valid, which they are not, Port Resources undermined its responsibilities under those agreements, rendering them invalid. Under § 785.23, the sleep need not be continuous but there must be "reasonable periods of sleep," as described by the 2016 Bulletin above. Because Port Resources' system failed to record and pay when frequent interruptions prevented "reasonable periods of sleep" but the shorter periods added up to 5 hours, and because it failed to allow employees to report non-clinical interruptions that prevented reasonable periods of sleep, the agreements are per se unreasonable.

> **c.    As explained in Section V, the time is compensable under Maine law and this creates an overtime Kickback violation under the FLSA for all workers.**

Under the FLSA, an employer must have paid all money owed to the employee under contract or any statute before it receives any credit for overtime. 29 CFR § 778.315, WH Opinion Letter 2001-7 ("Note, too, that under 29 CFR §778.315, employers must pay employees all of their straight time compensation due under an express or implied contract or under any applicable statute for the non-overtime hours worked before it can be said that the employer has paid proper time-and-one-half overtime compensation for the overtime hours worked.")[16] This is because the failure to pay the entire wage amount owed by state law is no different than paying the worker the full amount with overtime, and then requiring the worker to "kickback" the overtime pay.

## IV.    Port Resources' Motion for Summary Judgment Should be Denied.

Port Resources' motion for summary judgment is entirely grounded in  § 785.23. As explained above this rule cannot apply as a matter of law because the hours easy to record, the

---

[16] Available at https://www.dol.gov/whd/opinion/FLSA/2001/2001_02_16_7_FLSA.htm

workers did not reside for extended periods, the agreement was unilaterally imposed, and it did not consider all pertinent facts. But even if the regulation were in play, Port Resources cannot show as a matter of law that that the agreement is reasonable based on the pertinent facts. *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931 (9th Cir. 2004) ("Of course, not even § 785.23 treats such an agreement as dispositive. Rather, that guidance suggests that the parties' agreement should be accepted only if it is "reasonable" in light of the "pertinent facts."). And the central question as always is always whether the worker's time was spent primarily for the benefit of the employer. Given that the employer billed for this time, there is at the very least a factual dispute about who primarily benefited from the employees confinement.

**V.     Plaintiff Giguere is Entitled to Summary Judgment on Counts II-III.**

Even if reliance on USDOL letters prevents the FLSA claim, Maine law allows no exception in this situation when a worker is engaged in duty for the benefit of the employer but permitted to sleep with one ear open. While the definition of work under Maine law has been drawn from the same line of cases as the federal rules, this Court owes no deference to USDOL interpretations that are not persuasive. In *Crook v. Russell* the Maine Supreme Judicial Court set forth the standard for examining sleep time. "One of the most significant factors courts have used in analyzing the totality of circumstances in overtime pay cases is whether time spent on-call is primarily for the benefit of the employer or for the benefit of the employee." 532 A.2d 1351, 1354 (Me. 1987).

The Crook Court found that the lower court's findings were not plainly erroneous because they were based on competent evidence: "Here there was evidence that, far from being restricted in the use of their leisure time, Crook and other employees were free to come and go as they wished during the period of time they were on-call at night. Testimony the trial justice

found credible indicated that no employee was forced to remain at the station while on-call. On the contrary, as members of a close-knit group of individuals engaged in specialized work in a small Maine town, they voluntarily sought out the company of one another at defendant's ambulance station. In these circumstances, the trial justice's failure to find that the time Crook spent on-call was primarily for the benefit of Russell was not clearly erroneous." *Crook* at 1354.

The contradistinction is obvious. The undisputed facts in the present case show that the only reason the workers stay at the group home and away from their families is to serve the employer.  The employees suffer because the sleep is substandard and they are unable to do any of the normal things people do in their homes with their families. Their families suffer when the worker cannot help out with family duties. And the employer benefits because it is paid by the State of Maine for the care the worker is providing during these hours, and in fact are required to have somebody there providing the care.

Maine law specifically outlaws these non-compensated duty time agreements in 26 M.R.S. § 629. ("A person, firm or corporation may not require or permit any person as a condition of securing or retaining employment to work without monetary compensation.") The agreements here require the workers to provide the care overnight for free in order to retain their jobs for the rest of the week. Ultimately if it is not dispositive that providing care for which the State reimburses is work, the Court must still deny the Defendant's motion for summary judgment because there would be a fact dispute about the primary beneficiary standard under Maine law. The "standard used for determining whether an employee is working while on-call and is therefore entitled to overtime pay is the totality of circumstances in a given case. This is a factual question that will vary from case to case and is to be resolved by the findings of a trial court." *Crook* at 1354**.**

## VI.    The Statute of Limitations is 3-years because Port Resources' Violations of the FLSA were Willful.

It is undisputed that Port Resources knew of the FLSA record-keeping and overtime obligations. It is undisputed that Port Resources knew that normally time required to be on the employer's premises was compensable work time. It would be disingenuous for Port Resources to assert that it did not know it was required to note for payroll purposes when LTSs were interrupted throughout the night. Further, Port Resources knew that the state was paying it to engage the service of workers around the clock. But nonetheless, Port Resources contorted USDOL guidance for relief employees to craft a policy that recklessly disregarded basic concepts of wage and hour law.

The regulations and opinion letters are undeniably confusing because the USDOL went out of its way to mollify the "major concern of employers operating residential care (group home) facilities" 1988 Memo. But Port Resources was on notice that these letters were highly dependent on specific facts. It then recklessly applied those letters in a novel and illegal way to have two full-time workers reside in the same room for an extended period of time in the same workweeks. And they did this while knowing they were being paid by the State to engage the services of these workers to provide care throughout the night. Coming up with a creative system that on the surface looked similar to the system in the interpretive memo recklessly disregarded the central tenant of the FLSA; that time spent predominately for the benefit of the employer must be compensated.

Port Resources could have taken the high ground and paid the Maine minimum wage ($7.50 during most of the time in dispute) and overtime for the time that the workers were engaged away from their homes and families. This would have been similar to the amount they eventually paid. But then the workers would have internalized their true pay level from the start.

By shaving hours, they were able to advertise a higher hourly rate.  Admittedly, willfulness in the FLSA statute of limitations context is a high bar. *Lopez v. Corporacion Azucarera de Puerto Rico,* 938 F.2d 1510 (1st Cir. 1991). ("A violation of the FLSA cannot be considered willful unless the employer acted not only unreasonably, but recklessly.") But Port Resources repeatedly made claims to the government for reimbursement of the workers' time during the sleeping period. At the very least the Court should deny Port Resources' motion and wait until after trial before it determines whether claiming employee time against the state that it shaves from the workers was reckless.

**V.      Conclusion.**

Port Resources crafted and unilaterally implemented an aggressive policy based on an interpretation of a regulation, and lost the forest for the trees. It is undisputed that Port Resources required the workers to stay on site alone overnight to provide direct support services and that MaineCare compensated Port Resources for these services. It is undisputed that Port Resources did not pay wages for this work. A rabbit hole of bureaucratic interpretations cannot obscure the common sense reality that Port Resources was the primary beneficiary of the Plaintiffs' sequestered time.

Dated: October 13, 2017

Respectfully Submitted,

   /s/Andrew Schmidt
Andrew Schmidt
Peter Mancuso
Andrew Schmidt Law, PLLC
97 India St.
Portland, Maine 04101
207-619-0884
Peter@MaineWorkerJustice.com
*Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2017, I electronically filed the foregoing with the

Clerk of the Court using the ECF system, which will send notification of such filing to the

following counsel:

Graydon G. Stevens, Esq., BN 299
*Attorney for Port Resources, Inc.*

KELLY, REMMEL & ZIMMERMAN
53 Exchange Street
P.O. Box 597
Portland, Maine 04112
(207) 775-1020
gstevens@krz.com

Dated: October 13, 2017

   /s/Peter Mancuso   
Peter Mancuso
Andrew Schmidt Law, PLLC
97 India St.
Portland, Maine 04101
207-619-0884
Peter@MaineWorkerJustice.com

*Attorneys for the Plaintiff*